## M. A. POLLARD v. PHŒNIX INSURANCE COMPANY.

1. PLEADING. *Traverse. Contract of fire insurance. Condition to render account of loss as soon as possible, construed.*

   P. sued an insurance company on a fire-insurance contract, and set out in the declaration that a fire occurred in June, 1884, destroying his stock of goods, and that he furnished the company with proof of the loss in the next September. The company pleaded that there was a condition in the contract that P. would render the defendant a particular account of his loss as soon as possible after the fire. P. replied that he did render a particular account of his loss as soon as possible after the fire, and "as the nature of the case and surrounding circumstances would admit." *Held*, on demurrer, that this replication directly traverses the plea and is sufficient, and that the addition of the words quoted was a mere expression of what the law implies in every such case.

2. FIRE INSURANCE. *Contract of. Privilege license of merchant. Section 589, Code of 1880, construed.*

   Under § 589, Code of 1880, which provides that any person who shall exercise any of the privileges enumerated in chapter ten, Code of 1880, "Without first paying the price and procuring license as required, shall on conviction be fined * * * * or imprisoned * * * or by both * * * and all contracts made with any person who shall violate this act, in reference to the business carried on in disregard of this law, shall be null and void so far only as such person may base any claim upon them, and no suit shall be maintainable in favor of such person on any such contract," a merchant who fails to procure any license or procures an insufficient license to carry on the business of merchant, as required by chapter ten, Code of 1880, cannot recover upon a contract of insurance against loss by fire on his stock of goods if the contract was made while he was without a license or had an insufficient license to carry on his business, since such contract of insurance is "in reference to" his business.

APPEAL from the Circuit Court of Chickasaw County.

HON. J. W. BUCHANAN, Judge.

Mrs. M. A. Pollard brought an action of assumpsit against the Phœnix Insurance Company. The declaration alleged that Mrs. Pollard was a merchant in Okolona; that she owned a certain stock of goods, wares, and merchandise there situated; that she entered into a contract of insurance against loss by fire thereon with the agent of defendant some time in February, 1884, the contract to run for one year; that this stock of goods was destroyed in June,

1884; that she made proof of loss, as required, in September, 1884, and that she performed all other acts and conditions required by the contract. The defendant pleaded in his fifth plea as follows:

That it was agreed between the parties that if loss was sustained, plaintiff would render a particular account of such loss as soon thereafter as possible, and that plaintiff did not render this particular account as soon thereafter as possible.

The defendant in his tenth and eleventh pleas pleaded substantially as follows:

That plaintiff's stock of merchandise was of the value of ten thousand dollars, and that she, desiring to carry on the business of a merchant, applied to the tax collector for license to carry on such business in accordance with chapter ten, Code of 1880; that she paid him ten dollars for such license, falsely and fraudulently pretending that her stock of merchandise would not exceed in value thirty-five hundred dollars; that plaintiff at the time this contract of insurance was made and before and since exercised a privilege enumerated in chapter ten, Code of 1880, entitled "An act in relation to public revenue," without procuring such license as the law required.

The plaintiff replied to the fifth plea, that she did render a particular account of her loss to the defendant as soon as possible after the fire and as the nature of the case and surrounding circumstances would permit. The plaintiff demurred to the tenth and eleventh pleas. The court sustained the demurrer. The defendant demurred to the replication, and the court sustained this demurrer also, and thereupon rendered a final judgment against the plaintiff, after having refused to allow the replication to be amended. The plaintiff appealed. Both parties agreed for the court to consider the demurrer to the tenth and eleventh pleas on this appeal.

*T. J. Buchanan, Jr.,* for the appellant.

1. The replication to the fifth plea is a direct traverse, negativing what is alleged in the plea. It tenders a direct issue, which should have been accepted. As a general rule of pleading, you can deny what is set up by the opposite party by a direct traverse

or set up new matter in avoidance. This tenders an issue which would have brought the merits of the controversy fairly to trial. If there is any objection to the traverse it is to the latter clause— " the nature of the circumstances would admit." If this clause had been stricken out the traverse would have been complete and not objectionable, even at the strict rules of the common law. If the clause was objectionable at all, it was for redundancy or surplusage, and the proper mode to reach it was a motion to strike out and not by demurrer. If the court had stricken out the latter clause of the replication the issue would have been perfect without it. The latter clause, though, is not objectionable for redundancy or surplusage, because it merely expresses what it implied in the preceding. The law implies in every condition to be performed that it should be performed as soon as the surrounding circumstances would admit. To tender an issue by direct traverse was proper in this peculiar case, because what was a reasonable time or compliance with the condition is a mixed question of fact and law to be submitted to the jury under proper instructions from the court. 52 Miss. 536 ; 2 Mich. 359.

2. What does " in reference to the business" mean ? Certainly, not every transaction of the merchant, however remote. There must be some limit—some dividing line. And here we have a statute pronouncing a fearful penalty upon a business not in itself immoral, but strictly legitimate, and one that the State ought to foster and throw around it every law that would aid and protect it, and hence presenting the strongest possible case for the strictest possible construction ; and such construction would force the court to interpret " contracts in reference to the business" to mean such transactions as are absolutely essential to the prosecution of the business.

Now, it will be seen that a contract of sale is so intimately connected with the business of a merchant that that business could not be carried on without it. But not so with insurance ; for it is frequently the case that merchants pursue their business successfully without any insurance whatever. A contract of insurance is accidentally and not essentially connected with the business of a mer-

chant, and therefore such a contract does not come within the provision of the statute of 1880. This act was passed purely to raise revenue, and not to condemn or in any way cripple the business or calling of a merchant. It was a tax upon the business or trade of the merchant, and if he failed to pay the license he forfeited the benefits of a contract connected with business—not the interest in the property unsold. Thus, for example, Story on Agency, page 23, limits the legitimate business of a merchant to buying and selling. He says: " If a merchant about to go abroad for temporary purposes should delegate to an agent his full and entire authority to sell any of his personal property or to buy any property for him on his account, to make any contracts, and also to do any other acts whatsoever which he could, if personally present, this general language would be construed to buying and selling in his ordinary business as a merchant." " A merchant's business is strictly buying and selling." 22 La. An. Rep. 523; *Graham & Anderson* v. *Hendricks;* Bishop on Stat. Crimes, § 1090. A contract of insurance is not dependent upon the business in any way. A person could have a large stock of goods and have the same insured, and not embark in the business of merchandising. They are independent one of the other. It is not a contract insuring his business; it is a contract insuring the interest he has in the property distinct and independent of the business. " An insurance contract or policy is not an incident to mercantile business." 16 Peters 503. " It can be separated and is therefore distinct."

*W. G. Orr*, on the same side.

1. It is thought that the court erred in sustaining defendant's demurrer to the plaintiff's replication to the fifth plea. The object of pleading is to arrive at an issue, and the rule is that when an issue is well tendered it must be accepted. Here the defendant said we did not make proof as soon as possible after our loss. In language as plain as can be used, we say we did. What more is required? Was it necessary, as contended in the court below, that we should set out *in extenso* the testimony upon which we relied to show that proof was made as soon as possible after the fire?

2. If the statute must be strictly construed, how can a contract

of insurance be said to be in reference to the business carried on? This tax is not levied upon the stock, nor is it levied upon the business carried on. It is levied upon the person who conducts the business, and the privilege when purchased is expressly declared to be a personal one, not incident to the stock, not running with the business, for if he who buys it transfers the business he is expressly prohibited from transferring the privilege. Section 595, Code 1880; 53 Miss. 13.

It is true the law says if you sell the stock of goods upon credit, without obtaining the license, you cannot collect from your debtors; but does the statute prohibit the owner from protecting the thing itself from loss by fire? We could readily appreciate the cogency of the reasoning if this were a suit brought upon a policy insuring profits. Assuming that such a thing is done, and the business carried on in violation of this statute, then the statute would apply, for in that instance the thing insured must grow directly out of, and depend immediately upon, the commission by the plaintiff of an illegal act, for unless there is an illegal sale there are no profits. But in the case at bar goods are insured, and it is not for the court or the insurance company to say what we were doing or were going to do with our property. What was plaintiff's business? Buying and selling goods. What class of acts or contracts are intended to be covered by the term, " reference to the business"? Contracts of sale, of course, contracts which necessarily run with the trade, contracts that are being made daily, contracts for profit, and in the natural course of business. This was a contract of indemnity, a contract for protection, not profit. If it were understood that henceforth contracts of insurance were to be regarded as sales for profits, a howl would go up from the insurance companies and their immaculate adjusters equaled only by the lamentations of the children of Israel when in the hands of the Egyptians.

*J. A. Orr,* on the same side.

The contract of insurance has no connection with the sale of the goods. It is independent of, and not touching the transaction condemned by law. It is based upon a new consideration, and has no reference to the disposition of the goods. The terms of the

contract of insurance imposes no obligation on the insured to sell the goods. He may box them; close his doors; give the goods to whomsoever he wishes. It is a contract to conserve property, to prevent its destruction, to add to the wealth of the nation. When I have paid for my policy I still have the goods on hand with the menace of the law staring at me. *Ocean Ins. Co.* v. *Polleys*, 13 Peters; cases sustaining it, 12 Michigan 135; *Toler* v. *Armstrong*, 11 Wheaton; 1 Addison on Con., § 252.

Addison on Contracts, § 260, states the rule favorably to the construction that the insurance contract is not at all necessary or essential to the business of the merchant, or of selling goods.

Now, what do the words " *in reference to the business* " mean? Of course, mercantile business. What do those words mean? Answer, *Graham & Anderson* v. *Hendricks*, 22 La. An. Rep. 523.

*J. A. Orr* also made an oral argument.

*Miller, Smith & Hirsh*, on the same side.

The statute of 1875 (Acts of 1875, p. 10, § 5) is broader in its terms than § 589, Code of 1880, and as the validity of that statute was upheld by this court in *Anding* v. *Levy*, 57 Miss. 51, the increase of public revenue, which is the rallying-cry of the defense, must have long since been made perceptible, and further effort in that direction should not be required.

But increasing the public revenue is one thing, and confiscating the property of a citizen is another, and the enlightened judicial mind cannot fail to mark the distinguishing line.

Pleas such as are here pressed by defendant are not favored by the courts, and a judgment of condemnation thereunder is never uttered, unless the facts clearly justify, and the law unequivocally sanctions, its promulgation. In the language of Lord Mansfield, as quoted in *Harris* v. *Runels*, 12 How. (U. S.) 79, we say: " The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of a defendant."

The case of *Anding* v. *Levy, supra,* conclusively settles the construction of the provision of the statute sought to be reached by these pleas, and pronounces it " highly penal."

Our contention is based upon two propositions:

1. That an insurance contract is collateral to the business of a merchant, and is not a contract "in reference to the business carried on" by him.

2. That the payment of the privilege tax to the collector, and the issue and the receipt of the license, is an adjudication of the right of the merchant to carry on business so far as parties other than the State are concerned, and is not a subject of collateral attack or inquiry.

*J. Hirsh,* for the appellant, argued the case orally.

*R. S. Buck,* on the same side.

We will consider the legal aspect of the case, with which the court has most concern. In *Anding* v. *Levy,* 57 Miss. 51, a similar statute to the one under consideration arose in our supreme court, and the court says: "The provisions of the statute are highly penal, and should not receive a construction which would extend it beyond the obvious purpose and object of the legislature in enacting it." Two things are to be conclusively inferred as decided by what the court said in the above paragraph. First, that the law under consideration is to receive a literal construction; and second, that only what was plainly meant by the language used could be construed as being within the legislative intent. Any number of authorities could be cited, in addition to this brief statement of the case, if it was necessary, to show that this § 589 of the code, imposing a penalty, can receive only a literal construction, and nothing that does not fall within the literal terms of it can be affected by its provisions. In view of this construction of §§ 585 and 589 of the code, that "contract" of insurance that was entered into by the appellant was not a "contract" which fell within the inhibition of the statute; that the policy of insurance was not the business that the law intended to prohibit when it declared that no "business carried on in disregard of this law be held null and void;" that the plaintiff did not "violate" this law or "disregard" the same, within the true intent and meaning of the act, cannot, to our minds, admit of a doubt.

*Houston & Williams,* for the appellee.

1. The latest utterance of this court, laying down the rule as to what should be the judgment of the court on sustaining a demurrer to a replication, is that of *M. & C. R. R.* v. *Orr*, 52 Miss. 541, in which they say that the judgment of the court on sustaining demurrer to the replication should be *quod recuparet* and not *respondeat ouster*.

The same rule had been laid down in *Ross* v. *Sims*, 27 Miss. 361. The cases referred to in brief of counsel for appellant, decided since, 52 Miss., *supra*, lay down the rule that if the demurrer is sustained for matter of *form*, then the court should allow the replication amended, for the obvious reason that a good answer to the plea is set up in the replication to the plea. The cases cited by appellant, decided prior to *M. & C. R. R.* v. *Orr*, we insist, have been overruled by this case.

2. The following cases hold that revenue and duty acts are not, in the sense of the law, penal acts, and are not therefore to be construed strictly; such laws are to be regarded as remedial in their character, intended to prevent fraud, suppress public wrong, and promote the public good. They should be so construed as to carry out the intention of the legislature in passing them and most effectually accomplishing these objects: Crabbe's Reports 376, commencing ninth line from bottom of page and to seventh line on 377; cases decided for Eastern District of Pennsylvania by Judge Hopkinson in February, 1840, affirmed in circuit court in June, 1840, see Ib. 404, and afterward affirmed in Supreme Court U. S., January Term, 1845, see 3 How. U. S., 197–210; Cliquot's Champagne, 3 Wallace 145, two lines from top, uses the language given above; *Rankin et al.* v. *Hoyt*, 4 How. U. S. 332.

The rule that statutes are to be so construed as to accomplish the legislative purpose or intent and to advance the remedy and suppress the mischief is primary and controlling. Potter's Dwarris 184, last six lines of text; 7 John. (N. Y.) 440 and 441; 8 John. 43 and 34; *Hart* v. *Cleis*; 7 How. (Miss.) 23.

The intention of the legislature must be ascertained from the words of a statute, and not from any general inferences to be drawn from the nature of the objects dealt with by the statute.

*Fordyce* v. *Bridges*, 1 H. L. Cas. 1. This case is apt and to the point.

The words of the statute relied on in the case at bar are " * * * and all contracts made with any person who shall violate this act, in reference to the business carried on, etc., * * * shall be null and void * * * *."

It does not say who shall violate the statute by paying no part of the price, but says " who shall violate this act " (*i. e.*, by not doing and paying all that the act requires) without any qualification whatever. Again, it does not say necessary reference nor direct reference, but only " in reference to the business carried on," with no qualification whatever. And though contracts of sale of goods be clearly within its provisions, this does not limit its application to such contracts.

In seeking to interpret the phrase " in reference to the business," and to determine whether a contract of insurance on the stock employed in said business is a contract in reference to the business, it may aid us to inquire

1st. What kind of contracts a general agent employed to attend to said business could, by virtue of his implied powers, make, so as to bind his principal. Only those, I submit, in reference to said business.

2d. Whether he could bind his principal by a contract of insurance on said stock or business. I submit he could. In the case at bar, O. Pollard, as agent of his principal, M. A. Pollard, made this insurance contract. 4 Amer. Rep. 312.

*W. T. Houston,* of counsel for the appellee, argued the case orally.

*Nugent & McWillie,* on the same side.

Payment of the price, not half nor more of the price, is absolutely required, and no license can be valid or lawfully issued without such payment. If a less price be paid and license be issued, it certainly could not avail the plaintiff so far as to make lawful the exercise of a privilege greater than that bargained for. The most favorable view to take of the case is that, to the extent of the price paid, the business would be lawful. But this view is not sound,

as held in the case of *Taylor* v. *United States*, 3 How. 211. The business could not be partly lawful and partly unlawful; it was one business and one store, and the whole concern was tainted.

Contracts made with any person who violates the revenue law, in respect to the business carried on in disregard of it, are nullified. The violation of the revenue law, in respect to business carried on in disregard of it, visits this penalty upon the offender. All contracts made with him are avoided; but, of course, these contracts must have some relation to his business. A purely collateral, independent contract, having no relation to or connection with the business thus carried on, would not be affected. This follows from the fact that the business is unlawful unless licensed, and the individual is not incapacitated to contract, except in reference to the unlawful business. Generally his power to contract is not limited in any way different from other people. In reference to the business illegally considered, he can make no contract whatever; there can be no "store" except as licensed, and when unlicensed no contract in reference to its business. That the contract of insurance is not of this character must be beyond all doubt. In all cases there is but one distinction, and that is between cases where the contract is void in its inception, because it is entered into for the purpose of protecting a prohibited traffic, and those cases where the contract is purely collateral, and into which no illegal design enters, although by the subsequent acts of the assured it becomes *remotely connected with the illegal transactions.* The test is this, can the plaintiff recover without showing that he was a merchant, and the value of the goods insured? If not, his assertion of claim demonstrates his own turpitude and the utter invalidity of his insurance. That the defendant must show the plaintiff's failure to pay the legal price for the privilege he exercised can make no difference. The issue grows directly out of the facts necessary to be shown by the plaintiff, and the business was unlawful without the payment of the price.

*W. P. & J. P. Harris,* on the same side.

We think it very clear that one who procures a license under a fraudulent undervaluation stands on the footing of one who exer-

cises the privilege without "paying the price and procuring the license as required," that is to say, one who carries on the business without a license.

The framers of the act saw that if a license *proprio rigore* should avert the consequences of forfeiture of rights under contracts, the most potent of all the persuasive provisions of the law, to wit, the closing of the courts against the delinquent, would be of little value. The evil most to be feared in reference to business of varying volume is fradulent undervaluation. That is an evil which affects all revenue systems. The idea that the lawmaker regarded the violation of the law in this respect as not being attended with the consequences which attach to a failure to procure a license cannot be entertained. Very few persons openly disregard the law by carrying on business without a license; very many evade it by willful undervaluation.

There is a difference between the act of 1880 and those of 1875 and 1878, and the difference is in the direction of increasing the constraint upon business men. Section 596 is an important addition, and § 589 is more comprehensive, logical, and clear on the subject of the contracts of the unlicensed party, or delinquent.

In the former acts the declaration is first against "debts and claims which may accrue to any person on account of the business herein taxed," and no suit is allowed "to enforce the payment of such claims, or compliance with contracts in favor of any person or persons failing to pay, etc."

The language of the last clause seems broader than the declaration of nullity, and that declaration might receive a meaning too restricted. There could be no purpose to condemn all contracts of the defaulter, and no logical reason for singling out a class of contracts or for discriminating between contracts relating to the same business, if contracts in that business alone were to be affected. Again, the true spirit of the legislation, to confine the effect to the defaulter only, is more definitely evinced. Therefore we have it that *all contracts* made "in reference to the business." shall be unavailable to him who violates this law, but to nobody else.

The contracts are denoted by the most general words, describing

them as contracts having "reference" to the business; that is, they must have connection with it, and they need not be indispensable, but simply customary and usual.  There is a plain purpose not to interfere with any trade or business contracts with the defaulter, except to deny him the benefits which business men ordinarily secure to themselves by the various contracts common in the particular business.  They are still available to all the world except the delinquent.  He alone incurs forfeiture of rights under them.

The statute provides a test, and to that we must appeal.  That test is that the contract shall be made by one who is a defaulter, and it must relate to the business taxed, its advancement, its security, its permanence and prosperity, and its character.  To discriminate between these would subserve no purpose in advancing the objects of the law.

The object of the merchant is to secure profit, and he sells and secures payment by contracts, and in these times generally by security of one kind or another.  This is to avoid loss both of capital and income by insolvency of purchasers.  This is loss in one way.  There may be loss of both by other dangers which menace the business, and he takes indemnity against those dangers which threaten the capital or stock in trade.  Now it would be absurd to say that contracts for profit are under the law, and contracts to prevent loss above the law.

There can be no distinction between the business and the stock employed in it, contracts of purchase of stock, and contracts of sale.  It is impossible to conceive the business as distinct from the stock, and contracts looking to the preservation of the stock are contracts to support the business or for indemnity against its loss— are distinctly contracts in its aid.

*W. P. Harris* also made an oral argument.

CAMPBELL, J., delivered the opinion of the court.

The replication to the fifth plea was sufficient.  It directly traverses the averment of the plea that the plaintiff did not, as soon as possible after the loss, render a particular account of it, as required by the policy, and affirms that the plaintiff did render

such account as soon as possible, "as the nature of the case and surrounding circumstances would admit." The addition of the words quoted was the mere expression of what the law implies in every such case, viz.: that the particular account shall be rendered as soon as possible in the nature of the case, and under the circumstances in which the person is compelled to act.

We are called upon to determine whether one exercising the privilege of keeping a store without paying the price and obtaining license as prescribed by law, and effecting insurance of the stock of goods so employed, can recover on the policy in case of their loss. An answer to this question requires an interpretation of § 589 of the code, which declares that any person who shall exercise any of the privileges enumerated, "without first paying the price and procuring license as required, shall, on conviction, be fined * * * or imprisoned * * * or by both * * * and all contracts made with any person who shall violate this act, in reference to the business carried on in disregard of this law, shall be null and void, so far only as such person may base any claim upon them, and no suit shall be maintainable in favor of such person on any such contract."

The purpose of the act is manifest. It is to constrain those who would enjoy the privileges taxed to pay the price and obtain license by a twofold penalty, one being fine or imprisonment, or both, and the other disability to claim under any contract made in reference to the business carried on in disregard of law; one to be enforced through the machinery provided for the punishment of misdemeanors, and the other on the plea of the party sought to be held liable on the contracts made in reference to the business.

We repudiate the distinction attempted to be maintained between not obtaining license at all and obtaining an insufficient one. The statute denounces its penalty against him who fails to pay the price and obtain license, and he who pays the price of a business less than that prescribed, and carries on a business greater than he has paid for the privilege of conducting, is as much within the contemplation of the statute as he who pays no tax. It may be said that undervaluation is the form in which the chief frauds are committed

on the revenue. He who pays no tax is almost sure to attract attention to his default and to be visited by the penalty of the law, while successful fraud may be practiced by paying a small tax, and under color of the license thus obtained transacting business on a scale much larger than that authorized by the license purchased. As the statute is broad enough to include it, and the case of one who pays a small tax and does a large business is a common form of the evil sought to be remedied by the penalty prescribed, it must be assumed that the legislative purpose was to embrace it.

The statute does not deprive the owner of his property embarked in the business illegally carried on. The title is not in any manner affected. All the incidents of title remain, with the rights of owner, in all respects, as to the property, except that no contract made in reference to the business not duly licensed can be enforced by him who has violated the law in carrying on the business. The owner may resort to the courts, and maintain any action to the maintenance of which title to the property entitles him, unaffected by the fact that the property is employed in business unlawfully carried on, because the disability imposed by the statute extends only to rights founded on contracts made in reference to the business. The distinction is between title with its incidents and power to contract with respect to the subject of it. Not the title of the delinquent owner is impaired, but his capacity to make a contract he can enforce whereby to make successful the business he is illegally conducting.

The common law as to contracts founded on or growing out of illegal considerations furnishes no guidance in ascertaining the true interpretation of the statute. The common-law rule of invalidity of contracts was not looked to in framing this statute, which speaks the will of the lawmaker, and it must be found in the words employed for that purpose. It is, therefore, needless to inquire what would have been the rule if the statute had not declared the consequence of its violation. The question is, what does the statute declare? When that is ascertained it must prevail. Its language is plain and unambiguous. It declares that no suit shall be main-

tainable in favor of the violator of the law on any contract made by him in reference to the business carried on in disregard of this law.   The controversy is as to the scope of the expression, *"In reference to the business carried on in disregard of this law,"* for only as to such contracts is disability to maintain a suit imposed.   The language should not be extended beyond its plain meaning, nor should it be limited within narrower bounds.   We should not extend it by construction nor fritter it away by refinement, but should so interpret it as to effectuate the intention of the legislature in passing it.

What is the plain, ordinary, popular signification of the language employed, its natural, unstrained meaning?

We answer, it embraces all contracts in the prosecution of the particular business, which relate to it, and have for their object its maintenance, protection, or furtherance—all which pertain to it and grow out of it.

The phrase, " In reference to the business," is synonymous with having relation to, regarding, in respect to, concerning, pertaining to, it, and the contracts which the delinquent is incapacitated to claim the benefit of are those included in these terms.

Was the contract made in the prosecution of the business?   Did it grow naturally out of it?   Was it incident to it, connected with it, relating to it? did it regard it and pertain to it?   If so, it is one which the delinquent dealer cannot enforce, for to permit it would be to enable him to make valid contracts whereby to secure himself against loss in his illegal venture—to guard the cargo against perils incident to the forbidden voyage, and thereby save himself from the penalty declared against his temerity.

Is a policy of insurance on a stock of goods in a store carried on in violation of law a contract in reference to the business?   It is made to cover such goods as may constitute the stock when a loss occurs.   It is a contract for indemnity against loss.   It grows out of the business—it pertains to it and concerns it—it relates to it and is made for its success.   It is impossible to dissociate ideas of the stock of a merchant and the business in which he is engaged. True, buying and selling constitute the principal operations of a

merchant, but there are many accessories.   The illegality of the principal things involves and infects the incidents.  Shall it be said that the unlicensed dealer is incapacitated to make an enforceable contract to buy or sell goods, but he may make one for their preservation or for indemnity against their loss?  that although they are being used for profit in an unlawful business, and are kept for that purpose, a lawful contract may be made for indemnity against their loss by a casualty incident to the business?  although no enforceable contract may be made for their sale, one may be made for their conservation or replacement in order that they may continue to be dealt with in violation of law?   To permit the unlicensed merchant to stipulate for protection against loss of goods by a casualty incident to the business would be to allow him to acquire rights by contract from an illegal business, in the face of the statute which denies it.   The statutory incapacity relates to all dealing with reference to the stock of goods kept for sale. . The price of license is graduated with reference to the amount of such stock, and contracts pertaining to it are what cannot be enforced.   The scope of the business of a store embraces the purchase, care, preservation, and sale of goods, and the disability of the violator of the law extends to all the operations of the business.   He cannot claim the benefit of any contract made in its prosecution, growing out of it, and having relation to it.

So the law is written.

Were a merchant to make a power of attorney authorizing one to take charge of his store, and make all contracts "*in reference to the business*," it could not be denied that the agent might effect insurance on the stock, and bind his principal by a bill or note for the premium.   Why should the same language have a different meaning in a statute?

*Reversed.*